**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CLIFFORD W.,**[1]           ) | |
|                     ) | |
|       **Plaintiff,**     ) | |
|                     ) | **No. 17 CV 4850** |
| **v.**                 ) | |
|                     ) | **Magistrate Judge Jeffrey Cummings** |
| **NANCY A. BERRYHILL, Acting**  ) | |
| **Commissioner of Social Security,**  ) | |
|                     ) | |
|       **Defendant.**   ) | |
|                     ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Clifford W. ("Claimant") filed a motion for summary judgment seeking to reverse or remand the final decision of the Commissioner of Social Security ("the Commissioner") denying his claim for Child's Disability Benefits ("CDB"). The Commissioner has filed a cross-motion for summary judgment asking the Court to uphold the Commissioner's final decision. For the reasons set forth below, Claimant's motion for summary judgment (Dkt. 14) is granted insofar as it requests remand for further proceedings, and the Commissioner's motion for summary judgment (Dkt. 25) is denied. The Commissioner's final decision is reversed, and the case is remanded for further proceedings consistent with this Opinion.

## I. BACKGROUND

### A. Procedural History

Claimant applied for CDB on July 30, 2013, alleging disability beginning on August 1, 2000 due to anxiety, body dysmorphic disorder, obsessive compulsive

---

[1] In accordance with Internal Operating Procedure 22, the Court refers to Plaintiff only by his first name and the first initial of his last name.

disorder, and attention deficit disorder/"over focus" issues. (R. 51-52, 60, 80, 248.) The Social Security Administration ("SSA") denied Claimant's application initially on February 10, 2014, and upon reconsideration on October 1, 2014. (R. 60, 71, 76-80, 83-86.) Claimant requested a hearing before an Administrative Law Judge ("ALJ"), which was scheduled for September 14, 2015 at 11:15 a.m. (R. 87, 136.) Claimant acknowledged being notified of the hearing and indicated that he would attend. (R. 164.)

But Claimant did not appear for the September 2015 hearing (although his attorney did). (R. 43-50.) The ALJ continued the hearing, but she emphasized that the continuance was a "one-time deal": if Claimant did not show up for the next hearing, she would hold it without him. (R. 47-50.) The hearing was continued and rescheduled to January 7, 2016 at 2:15 p.m. (R. 177.) Claimant acknowledged being notified of the rescheduled hearing and again indicated that he would attend. (R. 175.)

Claimant did not show up for the January 2016 hearing either. (R. 29-33.) Claimant's attorney requested a continuance, but the ALJ denied his request. (R. 29, 31, 34.) The ALJ then proceeded in Claimant's absence, hearing testimony from a vocational expert ("VE") and allowing Claimant's attorney to offer closing comments. (R. 34-42.)

On February 8, 2016, the ALJ issued a written decision denying Claimant's CDB application. (R. 10-28.) The Appeals Council denied review on April 25, 2017, making the ALJ's decision the final decision of the Commissioner. (R. 1-5); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

**B. Relevant Medical Evidence**

**1. Treating Sources**

Claimant began seeing Paul Harris, M.D., in June 2003 for therapy and medication management related to his depression and anxiety. (R. 256-57, 336-39.) The records from Dr. Harris's first visit with Claimant noted a GAF[2] score of 50, and records from subsequent visits repeated this score. (R. 309, 312, 316, 322, 330, 334, 338.) After a half dozen visits, Claimant quit seeing Dr. Harris in October 2003 so that he could see a psychiatrist closer to home. (R. 308-17, 320-23, 328-39.)

In early- to mid-2012, Claimant began seeing Tucker Wildes, a licensed clinical social worker, for therapy and individual counseling. (*See, e.g.*, R. 350, 441-50, 546, 752, 754.) Ms. Wildes referred Claimant to Mark Amdur, M.D., for psychiatric care, which consisted of medication management and evaluation regarding Claimant's anxiety, body dysmorphic disorder, and obsessive compulsive disorder. (R. 252, 345, 549-50, 554.) In June 2012, Claimant saw Dr. Amdur for a psychiatric evaluation. (R. 342-45.) Upon evaluation, Dr. Amdur diagnosed Claimant with "markedly severe obsessive-compulsive disorder and associated body dysmorphic disorder." (R. 345.) Dr. Amdur opined that Claimant's "[c]ompulsions and rituals are very time consuming" and his "[w]ork performance would be markedly slowed by trips to a mirror and by handwashing." (*Id.*) Dr. Amdur also believed that Claimant would be unable to both "maintain adequate work attendance" and "tolerate work stresses," and that Claimant would "have difficulty relating to coworkers and supervisors because of his

---

[2] "The GAF is a 100-point metric used to rate overall psychological, social, and occupational functioning, with lower scores corresponding to lower functioning." *Lanigan v. Berryhill*, 865 F.3d 558, 561 n.1 (7th Cir. 2017).

circumstantial speech." (*Id.*)  It appears that Claimant saw Dr. Amdur again in August

2012, and then once a year after that.  (*See* R. 562 (record of Aug. 2012 visit), R. 741-

42 (record of Aug. 2013 visit), R. 656 (noting that Claimant was "only required to see Dr.

Amdur annually" and indicating a visit scheduled with Dr. Amdur in October 2014)).

From mid-2012 through late 2015, Claimant received therapy and counseling

from Ms. Wildes.  (*See, e.g.*, R. 546-50, 552-617, 619-50, 656, 662, 665, 668, 671, 678-

79, 684-85, 697-98, 702-03, 707-28, 730-32, 734-40, 743-46, 749-52.)  In December

2015, Ms. Wildes completed a "Report by Case Manager or Therapist."  (R. 752-54.)

Ms. Wildes opined that Claimant suffers from obsessive compulsive disorder:

specifically, he is always anxious and obsessively thinks when he anticipates leaving his

home and encountering other people and situations.  (R. 752.)  This anxiety, in turn,

prevents Claimant from concentrating, keeping track of time, and leaving in a timely

manner even for activities he enjoys.  (*Id.*)  Per Ms. Wildes, it is still difficult for Claimant

to get to his hockey games on time, and he usually arrives late even though he has

been trying to correct this pattern for over three years.  (*Id.*)  Ms. Wildes further opined

that Claimant's obsessive compulsive disorder markedly restricts his daily activities,

socialization, and ability to sustain concentration and attention.  (R. 752-53.)

### 2.  State Agency Consultants

In January 2014, state agency consultant Michael Schneider, Ph.D., reviewed

Claimant's medical records at the SSA's initial stage of review.  (R. 51-58.)  Later that

year, state agency consultant Tyrone Hollerauer, Psy.D., reviewed Claimant's medical

records at the SSA's reconsideration stage of review.  (R. 61-70.)  Drs. Schneider and

Hollerauer both opined that prior to turning 22 years old, Claimant experienced

moderate restriction in his activities of daily living and moderate difficulties in maintaining both social functioning and concentration, persistence, or pace.  (R. 54-57, 65, 67-68.)  Both consultants also concluded that during the relevant time, Claimant "was mentally capable of working in a setting that allowed him to work in isolation from others."  (R. 57, 68.)

### C.  The Vocational Expert Testimony

A Vocational Expert ("VE") testified at the January 2016 hearing.  (R. 34-39.) The ALJ asked the VE to consider a hypothetical individual who, although having no exertional limitations, had the following non-exertional limitations, which resulted from moderate restrictions in activities of daily living, social functioning, and concentration, persistence, or pace: no public interaction; occasional interaction with supervisors and coworkers; and low stress work, which the ALJ defined as occasional changes in the workplace setting and simple decision-making.  (R. 35-36.)  The VE testified that such an individual could work as an offbearer, machine feeder, fastener, or a folder.  (R. 36-37.)  The VE also testified that to be an employable, an individual would have to be on-task approximately 85 percent of the time and could not have more than 11 unscheduled absences in a year (less than one per month).  (R. 38-39.)

## II.  ANALYSIS

### A.  Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and is free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (citations and quotations omitted). Although this Court must consider the entire administrative record, it will "not 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the'" ALJ. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003), *quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). This Court will "conduct a 'critical review of the evidence'" and will not let the ALJ's "decision stand 'if it lacks evidentiary support or an adequate discussion of the issues.'" *Id.*, *quoting Steele*, 290 F.3d at 940. Additionally, although the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure [the Court] that the ALJ considered the important evidence . . . [and to enable the Court] to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993), *quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985).

### B. Analysis Under the Social Security Act

To qualify for CDB,[3] an adult individual must, among other things, establish that he became "disabled" under the Social Security Act before he turned 22 years old. *Toliver v. Berryhill*, No. 17 C 4000, 2018 WL 6398912, at *1 (N.D.Ill. Dec. 6, 2018); *Snedden v. Colvin*, 2016 WL 792301, at *6 (N.D.Ill. Feb. 29, 2016). A person is disabled if he "has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which . . . has lasted or can be

---

[3] The analysis for CDB claims is essentially the same as it is for Disability Insurance Benefits claims, except that a claimant must establish that he became disabled before turning 22 years old. *Tolefree v. Berryhill*, No. 17 C 4000, 2018 WL 4538783, at *4 n.7 (N.D.Ill. Sept. 21, 2018).

expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether [he] can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing disability at steps one through four.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).  At step five, though, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

The ALJ here followed this five-step inquiry.  After noting that Claimant did not turn 22 years old until December 2004, which was after his alleged disability onset date of August 1, 2000, the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged disability onset date.  (R. 15.)  At step two, the ALJ determined that Claimant suffered from the following severe impairments before he turned 22 years old: body dysmorphic disorder and delusional disorder somatic type.  (R. 15-16.)

At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1) before turning 22 years old.  (R. 16-17.)  Next, the ALJ assessed Claimant's residual functional capacity ("RFC"), which "is the maximum that a claimant

can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The ALJ found that before Claimant turned 22 years old, he could perform a full range of work at all exertional levels but was restricted by the following non-exertional limitations: no public interaction; occasional interaction with supervisors and coworkers, and "low stress work," which the ALJ defined as "occasional changes in work place setting and simple decision making." (R. 17.)

At step four, the ALJ concluded that Claimant had no past relevant work. (R. 21.) At step five, though, the ALJ determined that there were jobs existing in significant numbers in the national economy that Claimant could have performed before turning 22 years old, such as off bearer, machine feeder, fastener, and folder. (R. 22.) As a result, the ALJ found that Claimant had not been disabled at any time before he turned 22 years old in December 2004. (R. 22-23.)

Claimant challenges the ALJ's decision on a number of grounds. The Court addresses each argument below.

### C. The ALJ Committed Reversible Errors by Evaluating Claimant's Disability Claim and Credibility Without First Obtaining Claimant's Testimony.

Claimant first contends that the ALJ committed reversible error by refusing to continue the January 2016 hearing when Claimant failed to appear and then holding the hearing in his absence. Relatedly, Claimant asserts that the ALJ's finding that his symptom allegations were "not entirely credible" is unsupported, particularly in light of Claimant's absence at the hearing. The Court agrees with Claimant on both points.

### 1. Claimant's Failure to Appear

The hearing for Claimant's disability claim was originally set for September 14, 2015 at 11:15 a.m. (R. 136.) Although Claimant acknowledged being notified of the hearing and indicated that he would attend, he did not do so. (R. 43-50, 164.) According to Claimant's attorney (who had spoken to Claimant's mother), Claimant had experienced "an extreme case of cold feet coupled with anxiety": he "was embarrassed and anxious and his – just couldn't get there within the timeframe given his anxiety and, you know, just couldn't make it[.]" (R. 45-46.) Claimant's attorney offered that maybe Claimant would have less trouble making it to a hearing in the afternoon. (R. 46.) The ALJ continued the hearing and suggested that Claimant request the rescheduled hearing to be held at 2:15 p.m., which was the ALJ's last hearing slot of the day. (R. 47-50.) The ALJ, however, emphasized that the continuance was a "one-time deal"; if Claimant did not show up again, she would hold the hearing without him. (R. 49.)

The hearing was rescheduled for January 7, 2016 at 2:15 p.m. (R. 177.) Claimant again acknowledged being notified of the hearing and indicated that he would attend. (R. 175.) Nonetheless, he again failed to appear. (R. 29-34.) As recounted by Claimant's attorney, Ms. Wildes went to Claimant's apartment to help him get ready to attend the hearing, but Claimant "was experiencing severe anxiety and [Ms. Wildes] just couldn't get him to come despite her efforts." (R. 31, 33.) Claimant's attorney also suggested that part of the problem was the distance from Claimant's residence (in Evanston) to the hearing location (in Orland Park). (R. 31-32.) He then requested a continuance on claimant's behalf. (R. 34.)

The ALJ denied the request, stating that there was "no way" she was going to continue the case again. (R. 32, 34.) The ALJ noted that Claimant returned his acknowledgement card saying that he would appear and that an inability to make a 2:15 p.m. hearing was "a little hard to follow." (R. 32.) The ALJ was also skeptical that the distance was an issue, as Claimant had lived in Evanston since 2011 and was "able to get to hockey games throughout [the] greater Chicagoland area." (*Id.*) The ALJ further noted that Claimant's more recent therapy notes described how he is able to get out of the house and get ready much more quickly. (*Id.*) Although the ALJ stated that she would normally consider issuing a notice to show case to an absent witness, she declined to do so in this instance, as she already had an explanation as to why Claimant did not show up. (R. 33.) The ALJ then proceeded with the hearing. (R. 33-42.)

In denying Claimant's CDB claim, the ALJ expressly found that Claimant did not have "good cause" for failing to appear at the January 2016 hearing. (R. 13.) And although the ALJ recognized that Claimant "did not offer testimony to further explain his limitations during the period at issue," she found that the statements already in the record concerning Claimant's symptoms were "not entirely credible." (R. 18, 20.)

The Court finds that the ALJ committed reversible error by refusing to continue the January 2016 hearing. An ALJ is to continue a hearing upon a showing of "good cause." *See* 20 C.F.R. § 404.914(c)(2) ("We will change the time or place [of a hearing] if there is good cause for doing so[.]"); Program Operations Manual System (POMS)[4] DI 33015.032(B) ("Continuances occur when either the claimant, representative or one or

---

[4] Although POMS is non-binding and has no legal force, an ALJ is required to follow it, and "courts consider it persuasive." *Jackson v. Colvin*, No. 13 C 5254, 2016 WL 3087056, at *2 (N.D.Ill. May 31, 2016); *see also Wash. State Dep't of Soc. & Health Servs. v. Keffeler*, 537 U.S. 371, 385 (2003) (explaining that POMS provides guidance and warrants respect).

more witnesses have good cause . . . for failing to appear at the scheduled hearing."). One example of good cause exists when a serious mental condition makes it impossible for the claimant to travel to the hearing. 20 C.F.R. § 404.936(f)(1)(i). Good cause may also exist when a "witness who will testify to facts material to [the claimant's] case" is unavailable and the "evidence cannot be otherwise obtained." *Id.* § 404.936(f)(2)(iv). Both these circumstances were present here.

First, Claimant did not appear for the January 2016 hearing because he "was experiencing severe anxiety and [Ms. Wildes] just couldn't get him to come despite her efforts." (R. 31.) Claimant's inability to leave his home -- even with the help of his caseworker/therapist -- for a mid-afternoon appointment seems indicative of a serious mental condition and not just run-of-the-mill jitters. As Ms. Wildes explained just a couple weeks before the hearing, Claimant has obsessive compulsive disorder and "is always anxious and has obsessive thinking when he anticipates leaving his home and encountering other people and situations." (R. 752, 754.) As a result, Claimant "cannot concentrate, loses track of time, and is unable to leave in a timely manner." (R. 752.) And if the ALJ had any doubts about Claimant's anxiety on the day of the hearing, the ALJ could have asked Ms. Wildes—who was present at the hearing—about it. (*See* R. 31-33.) The ALJ did not, and she apparently accepted the explanation given for Claimant's absence when she declined to issue a notice to show cause. (R. 33 ("I'm not going to [issue a notice to show cause] in this case. We've got an explanation why [Claimant's] not here.").) On the record before it, the Court believes that a serious mental condition might have prevented Claimant from attending the January 2016

hearing. Consequently, there was "good cause" for a continuance and the ALJ should have continued the hearing. *See* 20 C.F.R. § 404.936(f)(1)(i).

Second, the missing witness was *Claimant*, and the Court is unable to imagine a witness who would testify about facts more material to this case other than Claimant himself. *See* 20 C.F.R. § 404.936(f)(2)(iv); *cf.* POMS DI 33015.032(C)(1) (advising the ALJ to make clear that the hearing will be continued if "the non-appearing person is crucial to that hearing" when either the claimant or the claimant's representative fails to appear). What is more, the Court is hard-pressed to see how the ALJ could have satisfied her "basic obligation . . . to develop a full and fair record" without Claimant's testimony. *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (internal quotations omitted). Indeed, an ALJ's proper consideration of a claimant's testimony is vital to her RFC assessment. *See Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) (explaining that a claimant's testimony about his ability to work "should be an input into" an RFC determination); *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (explaining that "the assessment of a claimant's ability to work will often . . . depend heavily on the credibility of [the claimant's] statements concerning the 'intensity, persistence and limiting effects' of her symptoms"); *Craft*, 539 F.3d at 675-76 (explaining that an RFC is based on both medical evidence and other evidence, such as the claimant's testimony).

Nor does the Court see a satisfactory evidentiary substitute for Claimant's testimony. *See* 20 C.F.R. § 404.936(f)(2)(iv). Most of the medical evidence in the record was from 2010 and later, which was well after the relevant August 2000 to December 2004 time frame. (R. 18.) Thus, Claimant's testimony could have potentially provided the only evidence of his functional limitations during certain portions of this

time period. Yet by proceeding with the January 2016 hearing, the ALJ denied Claimant the opportunity to present such evidence. *See White v. Barnhart*, 235 F.Supp.2d 820, 826 (N.D.Ill. 2002) (noting that the Social Security Act requires that a claimant receive "an opportunity to be heard before his claim for disability benefits is denied").

The Court notes that Claimant was diagnosed with obsessive compulsive and body dysmorphic disorders, and his failure to appear at both hearings was the result of severe anxiety that appears to be closely linked to these mental disorders. (R. 31, 45-46, 345, 752.) An individual suffering from mental conditions such as these will have good days and bad days, and "a snapshot of any single moment says little about [the individual's] overall condition." *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Fuchs v. Astrue*, 873 F. Supp.2d 959, 971 (N.D.Ill. 2012) ("Mental illnesses are episodic by nature.") (citing *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006)). Thus, instances of Claimant doing better shortly before the January 2016 hearing are not necessarily inconsistent with his inability to get ready and leave his home on the day of the hearing. The same is true for Claimant's November 2015 acknowledgement that he would attend the rescheduled hearing; it is entirely possible that when he returned the acknowledgement, Claimant genuinely believed he would have no issues getting himself ready for a hearing at 2:15 in the afternoon two months later. (*See* R. 175.) But if on the day of the hearing, Claimant was having a "bad day" (as certainly seemed to be the case), neither his previous acknowledgement that he would attend nor the ALJ's prior warning would seem likely to have much effect on Claimant's ability to make it to the hearing on time. By refusing to continue the January 2016 hearing, the ALJ did not appreciate these possibilities.

### 2. The ALJ's Analysis of Claimant's Credibility is Fatally Flawed

Relying on boilerplate language that is frequently used in disability cases, the ALJ found that Claimant's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely credible." (R. 20). *See Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (describing identical language as "meaningless boilerplate because it fails to link the conclusory statements made with objective evidence in the record") (internal quotes and citation omitted). Claimant's non-appearance at the administrative hearing was a major reason for this finding. (R. 20.) Since the ALJ erred in holding the hearing without Claimant, however, she could not rely on his absence to discount his credibility. Although that error requires remand in itself, the Court addresses the ALJ's other reasons for the credibility assessment in order to clarify what should be considered on remand. [5]

A court may overturn a credibility determination if the ALJ fails to justify his or her conclusions with specific reasons that are supported by the record. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of her symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate the condition; and functional restrictions that result from or are used to treat, the claimant's symptoms. 20 C.F.R. § 404.1520(c); SSR 96-7p. When considering a claimant's symptoms, the

---

[5] SSR 96-7p governed the analysis of Claimant's symptom-related testimony at the time of the ALJ's February 8, 2016 decision. It has since been superseded by SSR 16-3p, which applies to ALJ decisions issued on or after March 28, 2016. *Costa v. Berryhill*, 2018 WL 6621324, at *9 n.9 (N.D.Ill. Dec. 18, 2018). On remand, the ALJ should apply SSR 16-3p to the entire period at issue. *Id.* Given the broad correspondence between SSR 96-7p and SSR 16-3p, the Court's analysis of the ALJ's credibility assessment will be fully applicable on remand.

ALJ must build a logical bridge between his statements and the record. *See Cullinan*, 878 F.3d at 603 ("A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence."); *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (requiring an analysis of the SSR 96-7p factors as part of a logical bridge for the credibility analysis).

SSR 96-7p places significant emphasis on the treatment that a claimant has sought to relieve his or her symptoms. The absence of treatment, or a failure to comply with treatment recommendations such as medication or therapy, may suggest that the claimant's symptoms are less severe than he has described them. *See* SSR 96-7p (noting that a claimant's statements may not be credible "if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed"). The ALJ found that was the case here because Claimant stopped taking his psychotropic medications in 2003 due to their sexual side effects. When his doctor changed the medication to Seroquel, the ALJ found that Claimant continued to complain of sexual side effects and stopped taking all of his antipsychotic medications. (R. 19.)

The record does not support the ALJ's analysis of this issue. On July 1, 2003, Claimant's psychiatrist changed his medications from Clomipramine and Buspirone to Seroquel after Claimant objected to their sexual side effects. (R. 328-29.) Instead of continuing to complain about the issue as the ALJ said, Claimant told his psychiatrist on July 11, 2003 that he had no sexual side effects and was willing to increase his dosage of Seroquel from 25 mg to 100 mg. (R. 329.) It is true that an October 28, 2003 treatment note states that Claimant did not want to take his medication "at the present

time" because of its sexual side effects. (R. 308.) The ALJ implied that Claimant stopped taking all psychotropic medications after that point, but the record makes clear that he continued taking them through the end of his alleged disability period on December 6, 2004 and beyond. These medications included Anafranil, Buspar, Prozac, Xanax, Luvox, Resperdal, Orap, Lexapro, Abilify, Celexa, and Zoloft. (R. 315, 317, 348, 363.) Some of these medications were prescribed through 2010. (R. 363.) The ALJ could not disregard these post-disability period medications because an ALJ is required to account for *all* of the relevant evidence, "including the evidence regarding the plaintiff's condition at present" after a disability period ends. *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010); *see also Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical treatment from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period.").

Other than the sexual issue, the ALJ found that Claimant did not complain of any other medication side effects. (R. 20.) She also did not consider the effectiveness of his medications. "Courts have condemned the ALJs for failing to consider such evidence when it was potentially relevant to the claimant's ability to work." *Brown v. Barnhart*, 298 F.Supp.2d 773, 795-96 (E.D.Wis. 2004) (citing cases); *see also* SSR 96-7p (stating that an ALJ should address the "dosage, effectiveness, and side effects" of a claimant's medications). The record shows that Claimant experienced serious side effects throughout the time he took psychotropic medications. During the alleged disability period they "caused depression" and weight gain. (R. 363.) They were also ineffective and left Claimant "very obsessive, anxious, [and] aggressive." (R. 363.)

From 2005 through 2008, Anafranil, Luvox, and Risperdal made Claimant "groggy, spaced out," and made him "very concerned about acne, issues, weight, [and] mirror checking." (R. 363.) Anafranil caused Claimant to gain 67 pounds. (R. 430.) In 2008 and 2009, Luvox made Claimant's procrastination worse and "started" his obsessive-compulsive symptoms. (*Id*.) Since aggression, depression, and obsessiveness are relevant to Claimant's ability to work, the ALJ was required to consider these side effects.

Medication compliance was not the only aspect of Claimant's treatment history that the ALJ criticized. She also found that his symptom-related statements were not fully credible because Claimant did not always attend his therapy sessions on a regular basis. The record supports the ALJ's finding that Claimant did not consistently attend therapy. (R. 308.) That does not mean, however, that she was justified in using that fact against Claimant without considering the issue with greater care.

SSR 96-7p states that an ALJ may not discount a claimant's symptom-related statements based on a sporadic treatment history without first inquiring into the reasons for the noncompliance:

> We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she did not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the issue of treatment *or, at an administrative hearing, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.*

SSR 96-7p (emphasis added). The ALJ did not – indeed she could not – comply with this requirement because Claimant was not at the administrative hearing to answer questions about his treatment history. Without first eliciting an explanation from

Claimant, the ALJ was not permitted to cite his sporadic therapy attendance to attack his credibility.  *See Craft*, 539 F.3d at 679 (stating that an ALJ "must not draw any inferences about a claimant's condition from this failure [to pursue treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care"); *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013).

The need to question Claimant about his compliance was especially important in this case because his treatment involved a mental impairment.  It is well-established that adjudicators must take special care in addressing noncompliance when the claimant suffers from a mental disorder.  That is because "mental illness . . . may prevent the sufferer from . . . submitting to treatment," including both psychotherapy and medication management.  *Kangail*, 454 F.3d at 630*; see also Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2006) (stating that "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently"); *Hunt v. Astrue*, 889 F. Supp.2d 1129, 1144 (E.D.Wis. 2012) (citing cases); *see also White v. Comm. of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself.").  The issue was not merely theoretical in this case.  The ALJ herself noted that Claimant alleged that his obsessive-compulsive rituals prevented him from being on time or even making appointments.  (R. 18.)  Claimant's attorney also argued that Claimant would have difficulty arriving at work in a timely manner because he did not always shows up for hockey games on time.  (R. 20, 39.)

The ALJ's only discussion of this issue involved a reference to a July 1, 2015 treatment note from social worker Tucker Wildes.  (R. 616.)  Ms. Wildes stated that

Claimant had begun teaching children's hockey classes in 2015. She stated "that he gets to his games on time, and he therefore will be likely to get to his skills class on time. (R. 616.) The ALJ failed to note, however, Ms. Wildes revised her July 2015 assessment by stating on December 14, 2015 that Claimant had significant difficulty in arriving at his games on time, even though "he has been trying to correct this for the past 3 plus years." (R. 752.) Claimant also plays hockey at night, "so he has the whole day to prepare and arrive on time." (R. 344). The nighttime nature of his activity was critical because psychiatrist Dr. Amdur agreed with Ms. Wildes that Claimant's obsessive-compulsive disorder made it difficult for him to be on time "particularly in the morning." (R. 342.) The psychiatrist stated that Claimant becomes anxious about leaving his house and therefore engages in "grooming or departure rituals" that "consume inordinate time" and defer his departure time from home. (R. 342-43). The ALJ erred by overlooking all of this evidence. That requires remand because "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Instead of directly addressing this evidence, the ALJ relied on two other lines of evidence to find that Claimant could function adequately outside his home. She stated at several points in her decision that he had played professional hockey in Sweden for a full year, though she did not identify the timeframe involved. (R. 18, 20.) According to her, Claimant functioned "without difficulty" in Sweden and was able to live either by himself or with a host family. (R. 20, 21.) The Court is unable to follow the basis of the ALJ's reasoning on this issue. Contrary to her version of events, the psychiatric records

state that Claimant only stayed in Sweden for three months, not a full year.  (R. 365).  And far from being "without difficulty," Claimant's mental health treaters were clear that his stay in Sweden was deeply *unsettling.*  Psychiatrist Dr. Laura Viner noted in March 2011 that his "experiences in Sweden disillusioned him, [and] he came home severely depressed.  [Claimant] never recovered from the profound demoralization of the loss of his dream and has not been able to launch his life since that turning point."  (R. 384, "The demoralization in Sweden was so profound for [Claimant] because he had a longstanding history of being bullied as well as very vulnerable self-esteem.")  Dr. Garrett Halweg agreed, stating in 2010 that when Claimant returned from Sweden, "he noticed that he was more depressed . . . and never got back to living a normal life."  (R. 384.)  Without addressing this evidence the ALJ had no basis for claiming, as she did on several occasions, that Claimant was less credible because he played hockey in Sweden.

The ALJ also took a more unusual approach to the issue by noting that Claimant had been arrested several times outside his home, received traffic tickets, shoplifted, and trespassed on property.  The ALJ concluded that this evidence showed that Claimant could leave his home "at some point during the day or evening without significant difficulty or concerns regarding his looks."  (R. 20.)  The ALJ appears to have reasoned that if Claimant could go outside to engage in these criminal activities, then he ought to be able to leave home in time to arrive at work on a regular basis.  The Commissioner agrees, pointing out that "these incidents could only take place outside the house."  (Dkt. 26 at 7.)

The ALJ's reasoning on this issue fails to build any bridge between the record and her credibility assessment. Neither the ALJ nor the Commissioner has explained what connection exists between Claimant's inappropriate behaviors outside the home – actions that would almost certainly preclude employment if they occurred in the workplace – and his ability to get to work on time on a sustained basis. Unlike work, one does not need to arrive somewhere on time in order to get a ticket or to shoplift. Nor does one have to leave home every day to commit a crime, as full-time work would require Claimant to do. Moreover, the fact that Claimant can engage in activities outside his house does not address his basic allegation in this case: he does not contend that he can *never* leave home; rather, his claim is that it takes an excessive amount of time to do so. (R. 342, "Time management and planning is a big problem for me").

Instead of citing these activities to discredit Claimant, the ALJ should have considered their implications about his social functioning.[6] No medical expert appeared

---

[6] At step two, the ALJ found that Claimant had a moderate restriction in activities of daily living and in his social functioning, and that he had not experienced any episodes of decompensation. (R. 16-17.) Claimant does not challenge the step two findings, perhaps because an error at step two does not require remand as long as the ALJ proceeds with the sequential analysis. *Smith v. Colvin*, 931 F.Supp.2d 890, 899 (N.D.Ill. 2013). Because this case already requires remand, however, the ALJ should reconsider these findings. The ALJ based her daily activities finding on Claimant's ability to play hockey in Sweden. As explained above, *supra* at p. 20, however, she failed to account for the record on this crucial issue. The ALJ also erroneously relied on the Sweden issue to find only a moderate social restriction. She further noted that Claimant had a "difficult relationship with his father." (R. 16.) That is true; Claimant was charged with assaulting his father. He also caused his mother to fracture her arm during the assault. (R. 343.) The ALJ overlooked the second point, and she did not take note of the extensive notations in the record concerning Claimant's aggressive tendencies. She said that he did not have problems with employers, but the ALJ failed to state that Claimant had to quit his retail job in 2001 because of depression. (R. 362.) His social relations at school were disrupted because "severe anxiety and depression" forced him to quit high school during his senior year. (R. 365.) Claimant also broke up with his girlfriend due to his mental impairment. (R. 19.) As for decompensation, Dr. Garett Halweg stated that Claimant had been hospitalized in 2002 and 2003 for severe depression and anxiety. The ALJ failed to explain why those events did not

at the hearing to clarify whether Claimant's illegal activities were linked to his mental impairments.  Nevertheless, the ALJ should have been alert to that possibility because the record strongly suggests a link between aggression and anxiety for Claimant. Claimant's psychiatric records state that his mental illness made him "very obsessive, anxious, [and] aggressive" in 2002 and 2003, and that he was "aggressive and [had] intense anxiety" in 2001.  (R. 363.)  Indeed, Claimant was hospitalized in 2002 for "anxiety and aggression," suggesting both the severity of his aggression and its link to anxiety.  (R. 344.)

Not surprisingly, some of the evidence relevant to these issues involve Claimant's own statements.  The ALJ recognized that the record contains subjective complaints that "suggest greater functional limitations" than the ones that she assessed for Claimant.  (R. 20.)  Although the ALJ did not identify what these complaints were, she found that she did not need to consider them because "there must be support by objective, clinical medical evidence" in order for subjective statements to be relevant to the credibility assessment.  (R. 20.)

The Court disagrees with this analysis.  Rejecting subjective claims outright because objective evidence does not fully support them constitutes a "fundamental error" in disability analysis.  *Adair v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015).  SSR 96-7p is very clear on this issue:  "[A]llegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p (emphasis omitted); *see also Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) ("[O]nce the claimant produces

constitute episodes of decompensation.  (R. 362, 364.)  *See Phillips v. Astrue*, 413 Fed.Appx. 878, 886 (7th Cir. 2010) ("Such episodes may include incidents like hospitalizations[.]").

medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence."). As *Carradine* points out, unverifiable subjective complaints may be all the ALJ has to go on at times. *Id.* at 754 (citing fatigue and pain).

Caution is especially necessary when a claimant's allegations concern mental illness. The regulations do not make objective tests *per se* requirements for evaluating mental impairments. Instead, mental conditions are evaluated by medical evidence that includes a claimant's "symptoms." 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.00B. Symptoms are defined as "*your own description of your physical or medical impairment(s)*," *i.e.*, the very kind of subjective statements that the ALJ in this case did not consider. *Id*. (emphasis added). Moreover, courts have rejected the position that objective tests are always necessary when considering mental impairments. *See*, *e.g.*, *Alma v. Berryhill*, No. 16 C 2035, 2017 WL 2936707, at *10 (N.D.Ill. July 10, 2017); *Ripley v. Colvin*, No. 12 C 9462, 2014 WL 2457702, at *12 (N.D.Ill. June 2, 2014) (citing cases); *Schwarz v. Barnhart*, 70 Fed.Appx. 512, 518 (10th Cir. 2003) (rejecting a strict need for objective testing). Certainly, the ALJ was not required to find that Claimant was credible because of his subjective statements. But she could not refuse to consider these statements just because the objective record did not fully back them up.

Thus, remand is warranted so that the ALJ can obtain Claimant's testimony and can consider all of the evidence available to her. *See White*, 235 F.Supp. 2d at 830-31 (remanding where the claimant's testimony was required to fully develop the record). Given Claimant's mental conditions and past failures to personally appear for scheduled hearings, the ALJ and Claimant should consider proceeding with the hearing on remand

via video teleconferencing[7] or, if that is impracticable, by telephone. *See* 20 C.F.R. §§ 404.929, 404.936(c). After obtaining Claimant's testimony, the ALJ should evaluate Claimant's symptom allegations in accordance with SSR 16-3p. In doing so, the ALJ should sufficiently articulate how she evaluated the full range of evidence, including Claimant's hearing testimony.

### D. The Expert Opinion Evidence

Claimant also challenges the ALJ's evaluation of several opinions in the record. An ALJ must consider every opinion in the record, including opinions from both "acceptable medical sources" and "not acceptable" medical sources. *Pogatetz v. Colvin*, No. 12 C 4060, 2013 WL 6687940, at *11 (N.D.Ill. Dec. 17, 2013); SSR 06-03p, 2006 WL 2329939, at *1-3 (Aug. 9, 2006). In doing so, the ALJ need only "minimally articulate" the reasons underlying her evaluation of the opinion evidence, a standard the Seventh Circuit has characterized as a "low bar." *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012); *Gully v. Colvin*, 593 F. App'x 558, 563-64 (7th Cir. 2014). Moreover, the Court "uphold[s] 'all but the most patently erroneous reasons for discounting'" an opinion. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015), *quoting Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010); *Stewart v. Colvin*, No. 14 C 1361, 2016 WL 81779, at *7-8 (C.D.Ill. Jan. 7, 2016). Even if an ALJ's evaluation is flawed, it will be upheld so long as it "rest[s] on a sufficient factual basis to support its ultimate conclusion." *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).

---

[7] In February 2015, before the first scheduled hearing, Claimant objected to appearing via video teleconference. (R. 135.) Considering Claimant's subsequent troubles with attending hearings in person, he should reconsider this option.

First, Claimant argues that the ALJ erred in rejecting the state agency consultants' conclusion that he could work if he was isolated from others.  Second, he argues that the ALJ erred in evaluating the June 2012 psychiatric evaluation from Dr. Amdur.  Third, he argues that the ALJ improperly rejected the GAF scores assigned by Dr. Harris.  Lastly, he argues that the ALJ erred in giving no weight to the December 2015 report from Ms. Wildes, his caseworker and a licensed clinical social worker.  The Court agrees with Claimant's challenges to the ALJ's decision.  Because this case already requires remand, however, the Court only addresses the issues in brief

***State Agency Consultants:***  In 2014, Drs. Schneider and Hollerauer both opined that before turning 22 years old, Claimant "was mentally capable of working in a setting that allowed him to work in isolation from others."  (R. 57, 68.)  The ALJ did not assign "great weight" to this portion of the doctors' opinions because she believed it was "not supported by the medical records from the critical period."  (R. 20-21.)  Although the ALJ did not specifically identify these medical records, she was presumably referring to notes indicating that Claimant lived (first with a host family and then on his own) and played hockey in Sweden after high school for about a year, from 2000 to 2001.  (R. 21, 431.)

Claimant contends, without explanation, that the ALJ's evaluation of the state agency consultants' opinions "hardly constitutes the kind of detailed and logical explanation required of an ALJ."  (Dkt. 15 at 13-14.)  But the ALJ was only required to "minimally articulate" her reasoning for rejecting the state agency consultants' "isolation" requirement.  *See Filus*, 694 F.3d at 868-69 (7th Cir. 2012).  The ALJ did so by pointing to what the ALJ said was Claimant's ability to live and play hockey in another country.

(R. 21.)  As noted above, *supra* at p. 20, however, the ALJ failed to account for the full record on this topic.  She said that Claimant functioned in Sweden "without difficulty." (R. 21).  Dr. Viner said that Claimant's experience in Sweden was led to such "profound demoralization" that it constituted a "turning point" for him.  (R. 384).  Dr. Halweg noted that Claimant "never got back to living a normal life" after he returned from Sweden.  (R. 365).  Without questioning Claimant about his experiences in Sweden, the ALJ had no information on the degree to which he was able to work with others.  The ALJ could not rely on Claimant's experience in Sweden to reject the state-agency experts' opinions without first accurately accounting for what that experience included.  Remand is therefore necessary so that the ALJ can question Claimant on this critical issue.

*Dr. Amdur:*  In June 2012, Dr. Amdur, Claimant's treating psychiatrist, opined that due to his "markedly severe obsessive-compulsive disorder and associated body dysmorphic disorder," Claimant would have difficulty relating to coworkers and supervisors and would be unable to maintain adequate work attendance or tolerate work stresses.  (R. 345.)  The ALJ refused to give this opinion "controlling or great weight."  (R. 21.)

Claimant contends that, in doing so, "the ALJ violated the treating physician rule and made up her own standards."  (Dkt. 15 at 14.)  Generally, a treating physician's opinion is given more weight than other opinions; in some circumstances, it is entitled to controlling weight.  *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); 20 C.F.R. § 404.1527(c)(2).[8]  Nonetheless, an ALJ may discount or even reject a treating

---

[8] In January 2017, the SSA adopted new rules for agency review of disability claims involving the treating physician rule.  *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017).  Because the new rules apply only to disability applications filed on or after March 27, 2017, they are not applicable in this case.  *See id.*

physician's opinion so long as she gives a sound reason for that decision. *Punzio*, 630 F.3d at 710; *Luster*, 358 F. App'x at 740.

Here, the ALJ supported her decision to not give Dr. Amdur's June 2012 opinion controlling or great weight by noting, among other things, that the opinion did not consider the period at issue before the ALJ. (R. 21.) This reason alone, which Claimant ignores in his briefing, provides a sound basis for the ALJ's decision. Because Claimant applied for CDB, the ultimate question before the ALJ was whether Claimant was disabled at some point between August 2000 (when he allegedly first became disabled) and December 2004 (when he turned 22 years old). (R. 14-15); *see Toliver*, 2018 WL 6398912, at *1. But Dr. Amdur did not first evaluate Claimant until June 2012—more than seven years after Claimant's 22nd birthday. (*See* R. 342-45, 549-50, 554.) As such, Dr. Amdur could not have provided any insight into Claimant's mental health and capabilities during the relevant August 2000–December 2004 time frame. *See Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) ("The fact that . . . Wilder got worse in 1988 and 1989 does not indicate how bad she was in 1986."); *Million v. Astrue*, 260 F. App'x 918, 921-22 (7th Cir. 2008) (explaining that medical evidence after the relevant insured period is relevant only to the extent that it "shed[s] light on [a claimant's] impairments and disabilities" during that time). Thus, the ALJ did not err in refusing to give Dr. Amdur's June 2012 opinion "controlling or great weight" based on the time period it addressed. *See Alexander v. Colvin*, No. 14 C 449, 2015 WL 1324327, at *4 (E.D.Wis. Mar. 24, 2015) (finding that because opinions offered by a treating physician in 2013 were silent as to the claimant's condition during the relevant

2010 to mid-2011 time period, the ALJ was justified in giving them little weight for that reason alone).

**Dr. Harris:** On numerous occasions between June and October 2003, Dr. Harris recorded Claimant as having a GAF score of 50. (R. 309, 312, 316, 322, 330, 334, 338.) The ALJ recognized these scores were "indicative of serious symptoms," but she gave them "no weight" because "the records revealed minimal treatment history and the notes are rather generic." (R. 21.) The ALJ also noted that Claimant had a girlfriend and was able to participate in an organized sport and travel abroad without significant difficulty during the relevant period. (*Id.*)

Without elaboration, Claimant asserts that the ALJ "summarily rejected the scores[,] . . . ignoring the difference between hockey and work, and the fact that [Claimant's] mental limitations led him to break up with [his] girlfriend." (Dkt. 15 at 14-15.) This undeveloped and perfunctory assertion is forfeited. *Gentleman v. Mass. Higher Educ. Assistance Corp.*, 272 F.Supp. 3d 1054, 1070 (N.D.Ill. 2017); *see also Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) ("It is not the court's responsibility to . . . construct the parties' arguments for them."). Furthermore, Claimant does not challenge the other reasons the ALJ gave for giving no weight to Dr. Harris's GAF scores: a "minimal treatment history" and "rather generic" supporting notes. (R. 21.) These are legitimate reasons to give a medical opinion less weight. 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); *id.* § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we

will give that medical opinion."); *see also Filus*, 694 F.3d at 868 (finding that the ALJ was entitled to discount an opinion based on "the infrequency of treatment, the cursory nature of . . . examination, and the lack of clinical tests"). Accordingly, Claimant has not shown that the ALJ erred in giving no weight to Dr. Harris's GAF scores.

**Ms. Wildes:** In December 2015, Ms. Wildes reported that Claimant is always anxious and obsessively thinks when he anticipates leaving home and encountering other people and situations, which, in turn, prevents him from leaving home in a timely manner, even for activities he enjoys. (R. 752.) Ms. Wildes further opined that Claimant's obsessive compulsive disorder markedly restricts his ability to sustain concentration and attention. (R. 752-53.) The ALJ gave "no weight" to this report because "it was completed by a social worker, who is not an acceptable medical source." (R. 21.) The ALJ also noted that Ms. Wildes's report does not address the relevant period and relies on subjective allegations. (*Id.*)

Although Ms. Wildes is not an acceptable medical source, see SSR 06-03p, at *2 (identifying licensed clinical social workers as "not 'acceptable medical sources'"), the ALJ was not permitted to summarily reject her report on this basis. *See Gerstner v. Berryhill*, 879 F.3d 257, 262-63 (7th Cir. 2018) (noting that the ALJ wrongly discounted a nurse practitioner's opinion "as coming from an unacceptable medical source"); *Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015) (finding that the fact that a nurse "is not an 'acceptable medical source'" was not an adequate justification for the ALJ's decision to reject the nurse's report); *Dogan v. Astrue*, 751 F.Supp.2d 1029, 1037-38 (N.D.Ind. 2010) (explaining that the ALJ was required to analyze an opinion from a non-acceptable medical source and "explain why it was or was not supported by medical

evidence of record").  Opinions from non-acceptable medical sources, such as social workers, are still "important and should be evaluated on key issues such as . . . functional effects."  *Waldron v. Berryhill*, No. 17 C 3928, 2018 WL 4643173, at *9 (N.D.Ill. Sept. 27, 2018) (internal quotations omitted); *see also Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) (noting that evidence from a non-acceptable medical source may be used to show how an impairment "affects a claimant's ability to function").  In fact, an opinion from a "not acceptable" medical source may outweigh the opinion of an "acceptable" medical source in certain circumstances.  SSR 06-03p, at *5.

Nonetheless, the ALJ also recognized that Ms. Wildes's report "does not address the period at issue" (R. 21), and this justification supports the ALJ's decision not to give the report any weight.  *See Berger*, 516 F.3d at 545 (upholding an ALJ's decision that "might not have been flawless" when it "rested on a sufficient factual basis to support its ultimate conclusion").  There is no indication that Ms. Wildes's report—offered in December 2015—sheds any light on Claimant's mental limitations and capabilities during the relevant August 2000 through December 2004 time frame.  *See Million*, 260 Fed. Appx. at 921-22.  At the earliest, it contains Ms. Wildes's observations of Claimant's mental capabilities starting in March 2012 (when she started seeing Claimant), which is still more than seven years removed from the relevant time period. (R. 752); *see Wilder*, 64 F.3d at 337 ("The fact that . . . Wilder got worse in 1988 and 1989 does not indicate how bad she was in 1986.").  Nor does Claimant explain how Ms. Wildes's December 2015 report reflects his condition between August 2000 and December 2004.  As was the case with Dr. Amdur's June 2012 opinion, the ALJ did not

err in refusing to credit Ms. Wildes's December 2015 report based on the time period it addressed.  *See Alexander*, 2015 WL 1324327, at *4.

**E. On Remand, the ALJ Should Ensure That Both Her RFC Assessment and Her Hypothetical Questions to the VE Adequately Accommodate Claimant's Limitations in Daily Activities, Social Interaction, and Concentration, Persistence, or Pace.**

Finally, the Court addresses Claimant's contention that his RFC failed to adequately accommodate his moderate limitations in activities of daily living, social interaction, and concentration, persistence, or pace.  After finding that Claimant suffered moderate difficulties or restriction in these functional areas, the ALJ crafted an RFC that (1) prohibited Claimant from public interaction, (2) allowed him occasional interaction with supervisors and coworkers, and (3) limited him to "low stress work," which the ALJ defined as "occasional changes in work place setting and simple decision making."  (R. 16-17.)  The ALJ intended for the low stress work restriction to accommodate Claimant's moderate limitations in concentration, persistence, or pace.  (R. 21.)

This case is being remanded so that the ALJ can hear and evaluate Claimant's testimony.  After doing so, the ALJ will need to re-assess Plaintiff's RFC.  *See, e.g., Bjornson*, 671 F.3d at 645 (explaining that "the assessment of a claimant's ability to work will often . . . depend heavily on the credibility of [the claimant's] statements concerning the 'intensity, persistence and limiting effects' of her symptoms"); *Craft*, 539 F.3d at 675-76 (explaining that an RFC is based on both medical evidence and other evidence, such as the claimant's testimony).  If the ALJ again finds that Claimant suffered limitations in his ability to perform activities of daily living, socially interact, or maintain concentration, persistence, or pace, both her RFC assessment and hypothetical questions to the VE should reflect those limitations.  *Varga v. Colvin*, 794

F.3d 809, 813 (7th Cir. 2015); *Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D.Ill. 2011) (finding that the claimant's limitations in these functional areas "should have been reflected as limitations in the RFC finding"). The ALJ should also ensure that she explains how her RFC assessment accommodates any such limitations. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (requiring an ALJ to explain her "analysis of the evidence with enough detail and clarity to permit meaningful appellate review").

The Court further notes that limiting a claimant to occasional changes in the workplace and simple decision making, as set forth in the ALJ's current "low stress work" restriction, does not adequately address moderate limitations in concentration, persistence, or pace. *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018) (limiting an individual to understanding, remembering, and carrying out simple work instructions, exercising simple work place judgments, doing routine work, and experiencing no more than occasional changes in the work setting did not accommodate the claimant's moderate limitations in concentration, persistence, and pace); *Radosevich v. Berryhill*, --- Fed. Appx. ----, 2019 WL 286172, at *2-3 (7th Cir. Jan. 22, 2019) (limiting an individual to "simple, work-related decisions" with "few, if any, workplace changes" did not accommodate the claimant's moderate limitations in concentration, persistence, and pace). The Seventh Circuit has "repeatedly rejected the notion that . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Varga*, 794 F.3d at 814 (internal quotations omitted). On remand, the ALJ

should keep these principles in mind when assessing Claimant's RFC and questioning the VE.

## III. CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment (Dkt. 14) is granted, and the Commissioner's motion for summary judgment (Dkt. 25) is denied. This case is remanded to the SSA for proceedings consistent with this Opinion. The ALJ is directed to: (1) hold an administrative hearing with Claimant present in person, by phone, or by video; (2) reconsider Claimant's activities of daily living, social functioning, and episodes of decompensation as part of the special technique analysis; (3) reevaluate Claimant's statements concerning his symptoms; (4) reconsider the weight given to the opinions of the state-agency experts; and (5) reassess Claimant's RFC.

ENTER:

Hon. Jeffrey Cummings
United States Magistrate Judge

DATE:  April 5, 2019